THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PRENTICE CRUSOE, Defendant-Appellant.

First District (1st Division)   No. 77-1462

Opinion filed December 28, 1979.

Ralph Ruebner and Michael Mulder, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Terence P. Gillespie, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Prentice Crusoe, was charged by indictment with the crimes of deviate sexual assault, robbery and attempt robbery. Following a jury trial, defendant was convicted of each charge. He was subsequently sentenced to concurrent terms of 10 to 30 years for deviate sexual assault, 3 to 9 years for robbery and 3 to 9 years for attempt robbery. Defendant appeals the judgment of conviction.

Defendant raises two contentions on appeal: (1) that the State's questioning of the arresting officer elicited hearsay evidence in contravention of his sixth amendment right to confrontation; and (2) that

defendant's fifth amendment right against self-incrimination was violated by the State's closing arguments concerning his failure to testify or call his mother on his behalf.

Because defendant does not contest the sufficiency of the evidence, only a brief account of the facts is necessary.

At about 10:45 a.m. on February 7, 1977, Joanne Jamerson and Callie Cunningham got off a Rapid Transit Authority-Congress Line elevated train at the Cicero Avenue station. They proceeded to walk up the Lavergne Avenue exit ramp. Near the top of the ramp, they were confronted by two men. The taller man was subsequently identified as defendant, Prentice Crusoe, and the shorter man was Michael Harris. Defendant threatened to kill Jamerson and Cunningham, forced them to undress and repeatedly struck both women. Jamerson was forced to perform oral sex upon defendant, while Harris rummaged through the women's purses and took $165 from Cunningham's purse.

Defendant and Harris then fled, heading north on Lavergne Avenue. Jamerson chased after the assailants. She asked the driver of a parked bus to call the police and continued pursuit. The assailants had not left her sight since leaving the R.T.A. station.

Jamerson saw Officers Stephen Strezepek and Michael Meka at the corner of Harrison and Lavergne. She told them she had been robbed and assaulted and pointed out her assailants, who were walking quickly in the opposite direction. Jamerson got into the officers' squad car and the officers pursued the assailants. The assailants began to run, splitting up as they ran between two buildings. Harris was eventually apprehended, arrested and searched. He was carrying $75 in cash. The officers then returned to the R.T.A. station to check the condition of Cunningham.

While Harris was being transported from the R.T.A. station to police headquarters, Strezepek stopped an unmarked tactical unit car driven by Officer Tobin. Tobin had a conversation with Harris and then proceeded to 5253 West Congress, 4½ blocks from the scene of the crime. Tobin arrived at about noon and rang the doorbell marked Crusoe. Defendant's mother answered the door and Tobin and the other officers entered the premises. Tobin then observed defendant come out of his bedroom. Defendant was breathing heavily and appeared nervous. Tobin placed defendant under arrest.

Officer Strezepek positively identified defendant at trial as one of the men he chased. Jamerson and Cunningham identified defendant as one of their assailants at a lineup and in court. The defense rested without presenting any evidence. The jury returned guilty verdicts on all counts and the trial court entered judgment on the verdicts.

■■ Defendant contends that he was denied his sixth amendment right to confront a prosecution witness by the State's introduction of hearsay

evidence. The State asserts that this issue is waived because it was not specifically included in defendant's motion for a new trial. Ordinarily this waives the issue on review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) However, even assuming the issue was not waived, we find no hearsay violation.

During the State's direct examination of Officer Stephen Strezepek, the following colloquy took place:

"Q. Did you have a conversation with Michael Harris at that time?

A. On our route back to the station, we had a conversation with him [Michael Harris], and he said—

MR. GREEN: Objection.

THE COURT: Sustained.

By MR. McDONALD:

Q. After that conversation, what if anything did you do?

A. Well, we ascertained—

MR. GREEN: Objection.

THE COURT: Objection will be sustained.

By MR. McDONALD:

Q. What did you do after having the conversation with Michael Harrison [sic], officer?

A. We were driving back to the 15th District.

Q. What did you do on the way to the 15th District?

A. We stopped an unmarked tactical unit car.

Q. Do you recall the name of any of those tactical unit officers?

A. Officers Tobin and Ikenjer.

Q. Did they remain in your presence?

A. Yes, they did.

Q. Did they return to the 15th District with you?

A. No.

Q. Where did they go, officer?

MR. GREEN: Objection.

THE COURT: Sustained.

MR. McDONALD: Where did you send them, officer?

MR. GREEN: Objection.

THE COURT: Sustained."

Officer Tobin subsequently testified that on February 7, 1977, he had a conversation with Officer Strezepek and Michael Harris and that following this conversation he proceeded to defendant's home and placed him under arrest. Tobin's pertinent testimony follows:

"Q. When you talked to that officer, where did that conversation take place?

A. In the area of Lake and Central.

Q. Would you tell the ladies and gentlemen who these officers were with when you had a conversation with them?

A. In the patrol car and in the back seat was Michael Harris.

Q. Did you have occasion to have a conversation with anybody other than the two police officers at that time?

A. Yes, sir, I did.

Q. Who did you have that conversation with?

A. Michael Harris.

Q. After having that conversation with Mr. Michael Harris, will you tell the ladies and gentlemen what you did?

A. Michael Harris—

Q. Without telling us what Michael Harris did, tell us what you did.

A. We went over and apprehended Prentice Crusoe."

■■ Defendant asserts that this testimony regarding the occurrence of a conversation with Harris and the subsequent arrest of defendant was improper because it permitted an inference that Harris made a statement to the officers which incriminated the defendant. We do not agree. The testimony of each officer was confined to the simple fact that a conversation with Harris occurred. There was no testimony as to the substance of the conversation. Indeed, hearsay testimony was prevented from being introduced into evidence by defense counsel's timely objections which were sustained by the trial court. Moreover, each officer testified in court, under oath and subject to cross-examination. Under these circumstances, the trial court properly admitted the officers' testimony. *People v. Finley* (1978), 63 Ill. App. 3d 95, 99-100, 379 N.E.2d 645.

Defendant's second contention is that the State improperly referred in closing argument to his failure to testify and commented upon his failure to call witnesses in his behalf. Defendant complains of these remarks:

"* * * If I recall, yesterday morning, we heard some testimony about the—should I say some talk about the defendant working at Burger King, the defendant being at home at the time of this offense, but you didn't hear one word of that from any of those witnesses that testified on the witness stand, did you?"

A defense objection to this statement was overruled.

Additionally, defendant challenges the following arguments:

"Counsel makes a big to do about the Defendant breathing heavily, ladies and gentlemen you heard the testimony as well as I did. Who was there at his home when the police officers arrived? His mother was there. Did you hear anybody come in and say he wasn't breathing heavily?"

The trial court sustained a timely defense objection to this remark and instructed the State not to argue the subject any further. Defendant's motion for a mistrial and a new trial on this ground was denied.

■■ Generally, where the defendant's timely objections to argument are promptly sustained, error is cured. (*People v. Radford* (1978), 65 Ill. App. 3d 107, 113, 382 N.E.2d 486.) In any event, we do not believe that either of the State's comments was improper.

■ The State's comments do not support an inference that the State was commenting upon defendant's failure to testify. Rather, reference is made to the failure of potential alibi witnesses to testify. Generally, "[i]t is improper for a prosecutor to comment on a defendant's failure to call a witness where the comment suggests that the witness would have testified unfavorably to the defendant and the witness is as accessible to the State as he would be to the defendant." (*People v. Gamboa* (1975), 30 Ill. App. 3d 242, 250, 332 N.E.2d 543.) However, when alibi witnesses are injected into the case by the defendant, they "are deemed unavailable to the prosecution and comment with regard to the failure of such witnesses to testify is proper." *People v. Mays* (1972), 3 Ill. App. 3d 512, 514, 277 N.E.2d 547.

In our view, the State merely commented upon defense counsel's misrepresentations to the jury during opening statements when defense counsel said:

"I think the evidence will show that the second man was not Prentice Crusoe.

The evidence will show, ladies and gentlemen, that he worked at Burger King from approximately twelve o'clock that evening to nine-thirty in the morning, when he got off work.

&ast; &ast; &ast;

When my client was arrested at home with his family, he had no money, and no orange waist-length jacket.

&ast; &ast; &ast;

&ast; &ast; &ast; You will hear about the investigation of the police followed that. How they confronted the women, and how they looked through the streets, and how my client was later on arrested at his home."

Thus, the defense injected Burger King staff and defendant's family into the case as possible alibi witnesses through these remarks. Contrary to these representations, defendant did not present any evidence at trial.

■ In short, the State's remarks served an entirely proper twofold function: (1) to remind the jury that certain testimony on behalf of the State remained uncontroverted (*i.e.*, defendant was at the scene of the crime and was breathing heavily when apprehended at his home) (*People v. McTush* (1978), 61 Ill. App. 3d 214, 377 N.E.2d 1148); and (2) that

potential alibi witnesses injected into the case by defense counsel representations did not testify on defendant's behalf. *People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170.

Accordingly, the convictions and sentences are affirmed.

Affirmed.

GOLDBERG, P. J., and CAMPBELL, J., concur.