THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EDWARD SCOTT, III, Defendant-Appellant.

First District (5th Division)    No. 79-1456

Opinion filed December 24, 1980.

James J. Doherty, Public Defender, of Chicago (R. H. R. Silvertrust and Timothy P. O'Neill, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Thomas Leanse, and Barry A. Gross, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of the offense of armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 18—2) and sentenced to four and one half to nine years in the penitentiary. On appeal, he raises the following issues: (1) that the trial court erred in denying his motion to suppress identification testimony resulting from an impermissibly suggestive showup procedure; (2) that the State failed to prove him guilty beyond a reasonable doubt; and (3) that the prosecutor's comments in closing arguments denied him a fair trial.

On November 21, 1975, at about 7:15 p.m., Beatrice Adams was on her way home from work. After alighting from a bus, she walked east on 84th Street toward her home at 8358 S. Aberdeen in Chicago, Illinois. As she crossed an alley about one block from her home, a man armed with a

revolver confronted her and demanded her purse which contained $40, credit cards and other personal effects. At this time, the assailant stood within a few feet of her. Due to the illumination provided by street and alley lights, she was able to observe his face during the one minute confrontation. He then grabbed her purse and fled down the alley. Adams cried for help, but after receiving no assistance, she ran to her home and called the police.

Fifteen minutes later, the police arrived at her home. She described the robber to them as a light complected black man, 17 or 18 years old, thin, slightly taller than she, with "funny eyes." He was wearing a stocking cap, a short-waisted jacket and dark pants. In addition, she recognized him as a resident of the neighborhood. After cruising the neighborhood with the police in an unsuccessful attempt to locate the assailant, she returned to her home at about 8 p.m.

Later that evening, Chicago police officer Duigman spoke with the officers who initially interviewed the victim. Then, upon receiving a description from her, he and his partner also toured the area. Because the description she gave fit defendant, with whom Duigman was previously acquainted, he was specifically searching for him as a possible suspect. Shortly thereafter, the two officers spotted defendant on a street corner about three blocks from the victim's home. Defendant, who was accompanied by two other men, was placed under arrest. At this time, he was dressed in dark pants, and a light-colored shirt, but wore neither a jacket nor a cap. No gun was found in his possession.

Duigman and his partner returned to the victim's home with defendant at about 10 p.m. Leaving defendant in the back seat of the car, Duigman entered Adam's home and spoke with her. She told him that she now remembered that the name of the person who robbed her was "Mo-toe." After being requested to view the suspect that the police had handcuffed in the back seat of the car, she went outside, looked into the car and exclaimed, "That's him, that's Mo-toe." Defendant responded by placing his hands on his head and stating, "Oh, my God."

Defendant presented an alibi defense which consisted of his testimony along with that of Warren Mack and Orlando Shufford. Mack and Shufford, who were defendant's friends, stated that at the time of the robbery, they, along with Stanley Spurlock, another friend, were with defendant at Mack's home. Defendant, known to his friends as "Mo-toe," arrived there with Shufford and Spurlock at about 6:30 p.m., and remained in Mack's bedroom listening to records and talking for the next 1½ hours. At about 8 p.m., Mack's mother asked the four if they would purchase some beer and cigarettes for her. As they returned from the store, defendant was arrested by the police.

OPINION

Defendant first contends that the trial court erred in denying his motion to suppress identification testimony resulting from an impermissibly suggestive showup procedure. Specifically, he asserts that the identification procedure used by the police, in displaying defendant, a single, handcuffed suspect held in a police car, to the victim denied him due process of law. U.S. Const., amend. XIV.

■▌ A defendant has a right to a full and fair pretrial hearing to determine whether a witness' identification of him was based solely on the witness' independent observation of the crime or whether it was influenced by unnecessarily suggestive police procedure or other extraneous factors which may have unduly affected the judgment and conclusion of the witness. (*People v. Robinson* (1970), 46 Ill. 2d 229, 263 N.E.2d 57.) In order to suppress identification evidence, a defendant has the burden of proving that the identification procedures were so unnecessarily suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*Simmons v. United States* (1968), 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967.) Where the pretrial identification is found to be inadmissible, an in-court identification will be admitted if the State can prove by clear and convincing evidence that the in-court identification had an independent origin arising from other uninfluenced observations of the defendant. (*People v. Lee* (1973), 54 Ill. 2d 111, 295 N.E.2d 449.) In *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243, the Supreme Court rejected a *per se* rule of exclusion of identification evidence following unnecessarily suggestive confrontation procedures. The *Manson* court stated:

> "We therefore conclude that reliability is the linchpin in determining the admissibility of identification testimony * * *. The factors to be considered are set out in [Neil v. Biggers (1972)], 409 U.S., at 199-200. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253. Accord *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.

■▌ In the instant case, we find that the circumstances of the pretrial identification did not involve a constitutional violation, as it occurred under reliable conditions. The victim observed the assailant at the time of the crime at close range for a period of about one minute under ample

lighting conditions. The descriptions she gave of the assailant to the police on two separate occasions were detailed and consistent. Adams indicated a high level of certainty in identifying defendant as the man who robbed her at the time of the confrontation and at trial. Finally, less than three hours transpired between the time of the crime and when she confronted him as he was handcuffed in the squad car. Although our supreme court has recognized the suggestiveness inherent in one-man showup procedures (see *People v. Blumenshine* (1969), 42 Ill. 2d 508, 250 N.E.2d 152), it has also upheld on several occasions a prompt identification of a suspect by a witness or victim near the scene of the crime. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Bey* (1972), 51 Ill. 2d 262, 281 N.E.2d 638; *People v. Young* (1970), 46 Ill. 2d 82, 263 N.E.2d 72.) These procedures tend to insure accuracy, not bring about misidentifications, because they "fosters the desirable objectives of fresh, accurate identifications which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trial is fresh." (*People v. Elam* (1972), 50 Ill. 2d 214, 218, 278 N.E.2d 76, 78.) Because the victim's identification of defendant was reliable, the trial court properly denied defendant's motion to suppress the identification testimony.

Defendant next contends that the State failed to prove him guilty of the crime of armed robbery beyond a reasonable doubt.

■■ A verdict of guilty will not be set aside unless the trial evidence is so improbable as to raise a reasonable doubt as to defendant's guilt. (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.) Identification by a single witness who had the opportunity to observe defendant is sufficient to support a guilty verdict. (*People v. Butler* (1976), 41 Ill. App. 3d 750, 354 N.E.2d 568.) There is no obligation on the trier of fact to believe alibi testimony over the positive identification of an accused, even though defendant offers a greater number of witnesses to support his theory. *People v. Barber* (1979), 70 Ill. App. 3d 540, 388 N.E.2d 833.

■■ The victim's positive identification of defendant before and at trial as the perpetrator of the armed robbery was based upon her opportunity to view him a few steps away from her for an entire minute in a well-illuminated area at the scene of the crime. Defendant wore no mask and made no effort to conceal his identity. This, coupled with her recognition of him as a resident of the neighborhood, allowed her to give a detailed description of him to the police resulting in his capture. Defendant asserts that her conduct in not immediately informing the police of the assailant's name despite her recognition of him was "highly unusual" and creates a reasonable doubt of his guilt. We find, however, that her actions were consistent with the evidence that she was excited at the time of robbery and could only recall the defendant's nickname after collecting her

thoughts a few hours later. The jury's verdict indicates that they evaluated the victim's testimony along with that of the defense witnesses and found the former's to be more credible. We can find no reason to disturb their determination of defendant's guilt.

Defendant's final contention is that certain comments made by the prosecutor during the initial and rebuttal closing arguments were improper and denied him his right to a fair trial. U.S. Const., amend XIV.

The first alleged impropriety occurred during the initial closing arguments when the prosecutor referred to the testimony of Warren Mack as "the most incredible I ever heard in my life." In addition, alluding to Mack's ability at trial to recall the precise time sequence of his and defendant's activities on the date of the crime 18 months earlier and his inability to remember any other relevant facts on that day, the prosecutor characterized the testimony as "absolutely insane." According to defendant those remarks improperly injected the prosecutor's personal opinion of the credibility of the defense witness.

While a prosecutor may not offer a purely personal opinion of the guilt of the accused, it is proper for him to argue or express his opinion that the accused is guilty where that opinion is based solely on the evidence. (*People v. Goolsby* (1977), 45 Ill. App. 3d 441, 359 N.E.2d 871.) It is not reversible error for a prosecutor to say that a witness lied if his statement is founded on the evidence. (*People v. Clark* (1975), 34 Ill. App. 3d 570, 340 N.E.2d 171.) The language which a prosecutor employs to depict a witness' testimony may be harsh if it has an evidentiary basis. See, *e.g., People v. Lewis* (1976), 38 Ill. App. 3d 995, 349 N.E.2d 528.

■■ Our review of the record shows that the testimony of Mack, a convicted felon, was, indeed, implausible and replete with inconsistencies. While on the witness stand, he altered his testimony several times regarding the clothing that defendant wore on the night of the crime. He couldn't remember what any of the other alibi witnesses, including himself, wore that night. Mack also stated that he knew nothing of the instant armed robbery which occurred in November 1975 until a week before the matter came to trial in May 1977. While he testified at trial to the events that transpired on November 21, 1975, the night of the crime, with stop-watch accuracy, he could not recall what occurred on November 20, 22, or 23 of 1975. Although the prosecutor's remarks about Mack's testimony were somewhat hyperbolical, they find substantial support in the record. Given this evidentiary basis, we conclude that the comments were proper and did not deny defendant his right to a fair trial.

The second prosecutorial comment challenged by defendant occurred in the rebuttal closing arguments. The prosecutor rhetorically posed to the jury the question of the conspicuous absence of Stanley Spurlock and Warren Mack's mother at trial. He then suggested to the jury

that these witnesses "wanted no part of the case"—implying that their testimony, if truthful, would have been contrary to defendant's version of the facts. Defendant maintains that these statements prejudiced him and resulted in error.

Generally, it is improper for a prosecutor to comment on a defendant's failure to call a witness where the comment suggests that the witness would have testified unfavorably to the defendant and the witness is as accessible to the State as he would be to the defendant. (*People v. Gamboa* (1975), 30 Ill. App. 3d 242, 332 N.E.2d 543.) However, when alibi witnesses are injected into the case by the defendant, they are deemed unavailable to the prosecution and comment with regard to the failure of such witnesses to testify is proper. *People v. Crusoe* (1979), 79 Ill. App. 3d 778, 398 N.E.2d 1095.

■■ In our view, the prosecutor's comments in this case were proper. During the defendant's case, reference was made to Spurlock and Mrs. Mack as potential alibi witnesses. Both allegedly had knowledge of defendant's whereabouts on the night in question. Defendant, having introduced the names of these witnesses into the case was justifiably exposed to the State's comment for his failure to produce them at trial. Hence, no error was committed by the State in this regard.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.